UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

ERNEST MURPHY,

                                Plaintiff,

 -against-

CITY OF NEW YORK, NYC DOC CAPTAIN
SHASEANNIA PITTMAN, #967, NYC DOC
OFFICER MICHAEL SINACORE, #15459, NYC
DOC OFFICER DAIN DEALLIE, # 18770,
NYC DOC OFFICER LAWRENCE GILKES, #
11150, NYC DOC OFFICER ROBERT
JOHNSON, # 3295, NYC DOC CAPTAIN
SONYA HARVEY, # 1109, NYC DOC
OFFICER JEAN-PAUL SOLOMONOFF, #
14831, NYC DOC OFFICER WINSTON
WHYTE, # 17093, NYC DOC CAPTAIN
KIMBERLY WILEY, # 98, NYC DOC OFFICER
STEVEN WALKER, #10317, NYC DOC
CAPTAIN WILLIE PERRY, #480, NYC DOC
CAPTAIN MICHAEL WILLIAMS #820, NYC
DOC CAPTAIN D. JOHNSON, #571 (f/n/u),
and NYC JOHN AND JANE DOE
CORRECTIONAL OFFICERS 1-15,

                              Defendants.
------------------------------------------------------------------ x

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

No. 16 Civ. 4415 (AJN) (JLC)

<u>PRELIMINARY STATEMENT</u>

    In this case, Plaintiff Ernest Murphy alleges that the New York City Department of Corrections ("NYC DOC") and its employees violated his rights on various occasions while he was in their custody awaiting trial from 2013 until 2016. On March 18, 2016, a jury of Mr. Murphy's peers acquitted him of all charges with the

exception of resisting arrest, and the judge sentenced Mr. Murphy to time served and ordered him released.

Defendants' first violation of Mr. Murphy's rights occurred when, within one month of Mr. Murphy entering NYC DOC custody, a number of Corrections Officers assaulted Mr. Murphy then falsely alleged that they found a handcuff key in his pocket. The handcuff-key charge was later dismissed on third-party review of surveillance footage, but as this complaint will describe, its consequences followed Mr. Murphy for the ensuing three years. Mr. Murphy also alleges other instances when Corrections Officers fabricated evidence against him and he was not afforded due process.

In particular, there were roughly four incidents of such rights violations over the course of Mr. Murphy's three-year detention, with certain of these being related by virtue of Defendants' recurring roles and, at times, retaliatory motives.

## NATURE OF THE ACTION

1.     This is an action to recover money damages for those rights violations arising from the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

2

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3.     This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.     Plaintiff demands a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.     Plaintiff Ernest Murphy is a citizen of Kings County in the State of New York.  A substantial part of the events underlying this action took place in New York County while Plaintiff resided in New York County in NYC DOC's custody and care.

7.     Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.     Defendant City of New York maintains the New York City Department of Corrections (hereinafter "NYC DOC"), a duly authorized public authority and/or corrections department, authorized to perform all functions of a corrections

department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

9.     Defendant NYC DOC Officer Michael Sinacore, # 15459, NYC DOC Officer Dain Deallie, # 18770, NYC DOC Captain Shaseannia Pittman, #969, NYC DOC Officer Lawrence Gilkes, # 11150 (f/n/u), NYC DOC Officer Robert Johnson, # 3295, NYC DOC Captain Sonya Harvey, #1109, NYC DOC Captain Michael Williams, #820, NYC DOC Officer Jean-Paul Solomonoff, #14831, NYC DOC Officer Winston Whyte, #17093, NYC DOC Captain Kimberly Wiley, #98, NYC DOC Officer Steven Walker, #10317, NYC DOC Captain Willie Perry, #480, NYC DOC Captain D. Johnson, #571 (f/n/u), and NYC DOC John/Jane Doe Officers 1-15, all individually, were at all times relevant duly sworn corrections officers, employees and agents of the NYC DOC and were acting under the supervision of said department and according to his official duties.

10.     At all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

11.     Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant City of New York.

## STATEMENT OF FACTS

12.     Mr. Murphy was a pretrial detainee at Rikers Island from 2013 until 2016.  In March 2016, a jury acquitted him of all charges arising from the 2013 arrest, except for the charge of resisting arrest, and he was released.  Over the course of those years Individual Defendants committed acts against Mr. Murphy which violated his constitutional and civil rights, as described herein.

### The July 30, 2013 Assault And Fabricated Charges—Later Dismissed—That Mr. Murphy Was Found With A Handcuff Key

13.     On or about July 30, 2013, Mr. Murphy was housed at the Otis Bantum Correctional Center ("OBCC") on Rikers Island.

14.     Individual Defendants searched Mr. Murphy and other detainees as they waited in line to go to the recreation yard.  This process required the inmates first, to go through a magnetometer and then, once cleared, to proceed to a line in a second room to await release to the yard.

15.     Mr. Murphy passed the magnetometer and he was sent to the second room where he queued up with the other inmates for recreation.

16.     Defendant Captain Pittman ordered Mr. Murphy to be separated from

the group for a random search.

17.    Defendant CO Sinacore ordered Mr. Murphy to take off his shirt and shoes.

18.    Mr. Murphy had taken off his shirt and was about to remove his shoes when Defendant CO Sinacore punched Mr. Murphy in the face with a closed fist.  Mr. Murphy had done nothing to justify the use of physical force against him.

19.    Mr. Murphy stumbled backward and other COs set upon him. Defendant Captain Pittman, Defendant CO Sinacore, Defendant CO Deallie and Defendant CO Giles punched, hit and slapped Mr. Murphy.  They also stomped and kicked him in his stomach and on his tailbone.

20.    These Individual Defendants handcuffed Mr. Murphy with flexi-cuffs and continued to assault him even as they took him to the clinic for medical attention for the injuries they had caused and continued to inflict.

21.    Individual Defendants had placed the flexi-cuffs on Mr. Murphy so tightly, the CO who cut them off in the clinic cut Mr. Murphy's wrist in the process. (The CO who cut them off was, on information and belief, was from a NYC DOC investigative team called in after Defendants' assault of Mr. Murphy.  As Mr. Murphy can best recollect, this individual was a shorter black male and he was working with a partner, who was also male.)

22.    Among other things, Mr. Murphy suffered lacerations and contusions

during the assault.  His felt pain, discomfort, stiffness and a "clicking" in his arm for some time after when moving it.  Furthermore, Mr. Murphy thereafter suffered great mental and emotional distress, as he felt great fear of his supposed caretakers from the very beginning of his pretrial incarceration.

23.     In August 2013, NYC DOC investigators took photographs of Mr. Murphy's injuries, which Mr. Murphy requested be preserved.

24.     After the assault, Mr. Murphy was informed that Individual Defendants wrote an infraction report against him alleging that a handcuff key had fallen out of Mr. Murphy's pocket during the beating.  Individual Defendants also alleged that Mr. Murphy had disrespected staff and assaulted staff.   None of this was true.

25.     In or around early August 2013 (it may have been August 3, 2013), Mr. Murphy attended the disciplinary hearing relating to the charge.  Pending the disciplinary hearing Mr. Murphy was kept in punitive segregation.

26.     The fabricated charges were dismissed as unsubstantiated.  On information and belief, this result was possible in grand part to the fact that Mr. Murphy's mother had called the Board of Commissioners and 311 with such insistence that the NYC DOC dispatched an Investigative Deputy Jones to look into the case and she obtained video surveillance footage showing that Mr. Murphy had successfully gone through the magnetometer by the time he was assaulted, which undermined Defendants' claim that this metal item popped out of Mr. Murphy's

pocket during the beating.

27.     At the time the charges were dismissed, Mr. Murphy had spent ten days in punitive segregation while severely injured.

28.     Despite the fact that all charges were dropped against Mr. Murphy, the false allegation that he had possessed a handcuff key stuck in his record and resulted in Mr. Murphy being designated a Centrally Monitored Case ("CMC") for the three years he was incarcerated.

29.     On or around August 9, 2013, ESU came and took Mr. Murphy to the George R. Vierno Center ("GRVC").  The reason Mr. Murphy was transferred to GRVC from OBCC at that time was because GRVC accommodated inmates who were on CMC status.

30.     Mr. Murphy did not understand why, if all of the charges against him had been dismissed, he would have CMC status requiring his transfer.  Mr. Murphy was entitled to a CMC hearing as per NYC DOC's own directives but never had one, despite his repeated requests over the years that this unfounded decision be reviewed.

31.     He filed an Inmate Grievance and Request for Investigation Program ("IGRP") form relating to the fabricated handcuff-key allegation and the CMC issue. The NYC DOC forwarded the IGRP to the OBCC Warden, stating that the matter was inappropriate for IGRP, but no action was taken by anyone at any time in the IGRP context or otherwise.  Mr. Murphy and his family also sought help in other

ways, for example, through communications with the NYC DOC Board of Corrections, or his mother would telephone 311 to request an investigation into the situation. Mr. Murphy also later filed an Article 78 challenging the CMC status. Despite all of these efforts, Mr. Murphy incorrectly remained on CMC status for the following three years, a fact with far reaching consequences.

32. Mr. Murphy's CMC status was reviewed periodically for the ensuing three years pursuant to the NYC DOC form titled "Review of CMC Designation 57/13." Every time Mr. Murphy's CMC status came up for renewal, it was renewed for the same reason—the handcuff key allegation. Yet this allegation had been deemed unsubstantiated. Mr. Murphy and his family also asked for reconsideration of these decisions as well with regularity. John/Jane Doe Officers' renewals of the CMC status designation demonstrates a failure to conduct true review.

33. The wrongful CMC status had far reaching consequences, unjustifiably requiring him to suffer atypical and significant diminution of his housing quality, personal safety, library access, educational, legal and betterment program access, transportation quality, bodily integrity, ability to use the judicial process to seek legal redress, the facility's treatment of his family visits, and more.

**Captain Harvey And The December 7, 2013 Fabricated Charges—Later Dismissed—That Mr. Murphy Assaulted A Fellow Inmate In A Pantry**

34. On December 7, 2013, Mr. Murphy was living at George R. Vierno

Center ("GRVC") in House A.  Another inmate named Joseph Francois was living in House B.  Although House A and House B were two completely different wings at GRVC, House A and House B did connect to a shared pantry.

35.     In order for a House A inmate to enter the pantry, a CO stationed at the House A entrance to the pantry would have had to buzz the House A inmate in ("the House A Gatekeeper CO").  The same was true for a House B inmate to enter the pantry.

36.     On December 7, 2013, Defendant CO R. Johnson, #3295, was working as the House B Gatekeeper CO and a different CO was working as the House A Gatekeeper CO.  The area captain was Defendant Captain Harvey, #1109.

37.     At some point after Defendant CO R. Johnson buzzed Mr. Francois into the pantry, another inmate allegedly cut Mr. Francois on the face.

38.     Defendant Captain Harvey and CO R. Johnson falsely stated that Mr. Murphy and another House A inmate named Nakwo Foxworth slashed Mr. Francois and Defendant Captain Harvey directed Defendant CO R. Johnson to write an infraction report stating that he saw Mr. Murphy entering House A from the pantry area.  (Note: On information and belief, Defendant Captain Harvey may have written the infraction report in Defendant CO R. Johnson's name because Defendant CO R. Johnson's later statement was different from what the incident report alleged, and also the signature on the infraction report appears to be that of Defendant Captain

Harvey.)

39.    The allegation that Mr. Murphy hurt Mr. Francois was implausible on its face because Defendant Captain Harvey—stationed in House B—and Defendant CO R. Johnson—the House B Gatekeeper CO—could not have seen Mr. Murphy leaving the pantry at the relevant time because this would only have been possible from the vantage point of the House A Gatekeeper CO.  Yet House A Gatekeeper CO did not say this.  Nor did the CO who was sitting in the pantry's CO "bubble" monitoring the room throughout the incident.  (On information and belief, the bubble CO was CO Kelly, who is a female officer of slightly less than average height.)

40.    In addition, Defendant Captain Harvey and Defendant CO R. Johnson's allegation was knowingly false because Mr. Francois had in the immediate aftermath of the assault identified someone else as his assailant.

41.    As a consequence of the false infraction report, Mr. Murphy spent seventeen (17) days in punitive segregation awaiting a disciplinary hearing relating to the charges.

42.    In the lead-up to the disciplinary hearing, Mr. Murphy repeatedly insisted that several of the above-described individuals to be called as witnesses at the hearing.

43.    The charges were dismissed without a hearing.

44.    On or about December 24, 2013, Mr. Murphy was released from punitive segregation with an apology from a Security Deputy and an Investigative

Unit Deputy.

45.     Defendant Captain Harvey later abused her authority again to violate Mr.

Murphy's rights, as described below.

**Mr. Murphy's Experience In Punitive Segregation**

46.     Life for Mr. Murphy in punitive segregation was different from his day-

to-day life "out of the box" for many reasons beyond social isolation for reasons

which include, but are not limited to, deprivation of sunlight and fresh air, cell

cleanliness, food, space and COs' willingness to treat him, and actual treatment of

him, with dignity.

47.     Taken together, Mr. Murphy's days in punitive segregation were not just

days he spent alone, but they were also cramped, dirty, stuffy, hungry, humiliating

days of deprivation.

**Captain Williams And The October 24, 2014 Fabricated Charges That Mr.
Murphy Was Found In Possession Of Marijuana And Tampered With A
Related Urine Test**

48.     On December 26, 2013, Mr. Murphy was transferred to a new facility,

this time Manhattan House, or Manhattan Detention Center ("MDC").

49.     On October 24, 2014, Mr. Murphy was in the MDC library.  Defendant

Captain Williams, #820, and Defendant CO Whyte, among other COs, entered the

library and searched the roughly twenty inmates present.  At Defendant Captain

Williams's direction, Defendant CO Whyte searched Mr. Murphy and found nothing.

50.    Even though Mr. Murphy was clean of contraband, Defendant Captain Williams directed Defendant CO Whyte to take Mr. Murphy to MDC intake where Defendant CO Whyte searched Mr. Murphy again and found nothing.

51.    Determined to find that Mr. Murphy had committed some infraction, Defendant CO Solomonoff subjected Mr. Murphy to a random urine test.  Defendant CO Solomonoff watched as Mr. Murphy urinated into a cup.  Then, when Mr. Murphy handed the sample to Defendant CO Solomonoff, Defendant CO Solomonoff said that the sample was too cool to have come from a human body.

52.    On October 24, 2014, Defendant CO Solomonoff wrote an infraction report falsely alleging that Mr. Murphy had tampered with evidence by producing clean urine which was not his own during the October 24, 2014 drug test.

53.    The charges were dismissed.

54.    Defendant CO Solomonoff wrote an infraction report falsely alleging that Defendant CO Whyte had found marijuana on Mr. Murphy.

55.    The charges were dismissed.

56.    On October 27, 2014, Defendant CO Solomonoff amended the second infraction report to state the allegations differently to clarify that he was submitting the infraction report on behalf of Defendant CO Whyte, who Defendant CO Solomonoff alleged had told him that Defendant CO Whyte found marijuana and had it tested.  It is unclear why Defendant CO Whyte, the CO who allegedly saw the

alleged marijuana firsthand, would not have written the report himself, instead leaving it to Defendant CO Solomonoff to write secondhand two times.

57.     After a disciplinary hearing in which Defendant Captain Wiley heard testimony from Mr. Murphy as a firsthand witness to what occurred.  Then, Defendant Captain Wiley heard Defendant CO Solomonoff's testimony about what Defendant CO Whyte had told him.

58.     In contravention of NYC DOC regulations and without explanation, Defendant Captain Wiley did not permit Mr. Murphy to be present for Defendant CO Solomonoff's hearsay testimony.  See, e.g., NYC DOC Directive #6500R-D III.C.9.a (requiring that an inmate be permitted to be present).  There was no reason to question Defendant CO Solomonoff outside of Mr. Murphy's presence.

59.     There was no reason for Defendant Captain Wiley to permit the hearsay testimony, which precluded her from being able to determine the credibility of Defendant CO Whyte.  Defendant Captain Wiley did not question why Defendant CO Whyte did not wish to himself testify.

60.     Defendant Captain Wiley then found Mr. Murphy guilty and sentenced him to twenty (20) days of punitive segregation.  By this time Mr. Murphy had already been held for some time in intake and other isolation.

61.     Defendant Captain Wiley's decision was an arbitrary decision in light of the fact that the subject infraction report with its facts arrived after two failed

infraction reports addressing the same incident and also in part due to the other

problems herein described.

**Captain Williams, Officer Walker And The May 11, 2015 Fabricated Charges—Later Dismissed In Criminal Court—That Mr. Murphy Was Planning To Escape Jail Using A Very Long Rope Made Out Of Bedsheets**

62.      In April 2015, ten or more random searches of Mr. Murphy's cell were

conducted, a high number that was not imposed upon the cells of Mr. Murphy's

inmate neighbors.  Nothing was ever found.  Sometimes the searches would take

place when Mr. Murphy was away, as was obvious when Mr. Murphy would return to

his cell to find his personal belongings in extreme and unreasonable disarray.

63.      Defendant Captain Williams and Defendant CO Walker were the

primary individuals disproportionately searching Mr. Murphy during this period

without cause.  As a result of this harassment of Mr. Murphy, Mr. Murphy's inmate

neighbors enjoyed greater privacy than he did.  The harassing searches that targeted

Mr. Murphy in this manner did not further any apparent penological interest.

64.      On April 22, 2015, Defendant Captain Williams, #820, and Defendant

CO Walker, #10317, searched Mr. Murphy's cell while he was away.  Strangely,

Defendants this time had been rougher than usual with Mr. Murphy's possessions and

they had even been rough with the cell's fixtures.  In particular, when Mr. Murphy

returned to his cell he found that Defendants had manhandled his sink so badly, they

had broken apart its wood framing such that it was loose.  Not wanting to be blamed

for damaging government property, Mr. Murphy reported the incident to Administrative Deputies and Mr. Murphy's mother called 311 about the incident.

65.    The searches, disproportionately directed at Mr. Murphy, continued.

66.    On May 11, 2015, Mr. Murphy was sent to take a urine test.  While he was gone, a Special Search Team from ESU conducted a random search of Mr. Murphy's cell.  The Special Search Team is comprised of three officers who receive special training for that purpose.  This particular Special Search Team was, as Mr. Murphy can best recollect, comprised of one female and two males.  One of the men may have had a name that begins with the letter T, perhaps Thompson.

67.    When Mr. Murphy returned to his cell, he found a notice telling him that the Special Search Team had searched his cell while he was away and found nothing.

68.    Shortly thereafter, also on May 11, 2015, Defendant Captain Williams, #820, and Defendant CO Walker #10317, appeared and announced that they wanted to conduct their own random search of Mr. Murphy's cell despite the fact that three members of the Special Search Team had just been there.

69.    Defendants had a long metal rod with a hook on the end of it, which they carried to the sink and used to snare something inside that was otherwise beyond human reach.  Defendants then pulled up a rope made out of bedsheets.

70.    Defendant Walker maliciously fabricated this evidence against Mr. Murphy.  First, the sink had not been broken until Defendant CO Walker searched

Mr. Murphy's cell on April 22, 2015, and deliberately broke it. Second, Defendant

CO Walker found nothing on April 22, 2015, such that for his report to be true, Mr.

Murphy would have had to collect bedsheets and make the rope in a very short period

of time. Third, in order to explain away the evidentiary problem just named,

Defendant CO Walker later incredibly stated that, in fact, on April 22, 2015, he felt

that he <u>had</u> seen a sheet rope inside the sink when he broke it apart (yet he failed to

explain why he would then leave it for two to three weeks). Fourth, Defendant CO

Walker needed a long metal hook to find and pull up the sheets, while Mr. Murphy

had no access to a similar tool. Fifth, there was nowhere to go with such a sheet rope

to achieve escape.

71.     Defendant CO Walker wrote an infraction report against Mr. Murphy.

72.     Defendant Captain Williams then took on the role of Investigation

Captain for that infraction report, despite the fact that Investigation Captains are

meant to be impartial third parties to an incident, and Defendant Captain Williams

had been personally involved in the incident. A NYC DOC directive states that the

agency "shall fairly prosecute" inmate infractions, and it says that the infraction must

be investigated by an official of Captain rank or higher who "must not have reported,

participated in, or witnessed the incident." <u>See</u> NYC DOC Directive # 6500R-D.

73.     As a consequence of this serious conflict of interest, Defendant Captain

Williams did not seriously address Mr. Murphy's allegations that Defendant Captain

Williams and Defendant CO Walker harassed him and set him up.

74.     Once Defendant Captain Williams had prepared the lion's share of the report, he gave it to Defendant Captain D. Johnson, #571, to present at Mr. Murphy's disciplinary hearing as the impartial Investigation Captain.

75.     Defendant Captain D. Johnson accepted it without questioning the problems it posed in terms of Mr. Murphy getting a fair hearing.

76.     On June 3, 2015, Defendant Captain Perry, #480, presided over a disciplinary hearing relating to the escape allegation.  Defendants did not advise Mr. Murphy of his Miranda rights prior to his testifying at the hearing, a problem in light of their plan to also criminally charge Mr. Murphy for possession of the sheet rope. See, e.g., NYC DOC Directive #6500R-D III.C.9.b (requiring Miranda rights).

77.     The hearing relating to the sheet incident deprived Mr. Murphy of due process.

78.     First, Mr. Murphy was made to testify at the June 3, 2015 hearing behind a steel door.  That steel door had a slot to permit communication with the outside world, but it was broken and permanent shut.  Defendant Captain Perry repeatedly stated during the hearing that he could not hear Mr. Murphy.  This was corroborated in Defendant Captain Perry's later ruling, as he noted that Mr. Murphy testified that Defendants had been persecuting him since 2007, yet Mr. Murphy was not jailed in 2007.

79.     As a consequence of the foregoing, Mr. Murphy was literally denied his right to be heard.

80.     However Defendant Captain Perry's understanding may have been compromised by making Mr. Murphy testify through metal without any opening, he indicated that he did understand that Mr. Murphy alleged misconduct on the part of Defendant Williams and Defendant Walker.  On information and belief, Defendant Captain Perry did not report this allegation of malfeasance to the Inspector General's Office as required.  See NYC DOC Directive #6500R-D III.c.17.

81.     Second, Defendant Captain Perry disregarded the fact that the supposedly impartial Investigation Captain report was actually compromised by a serious conflict of interest.  See NYC DOC Directive #6500R-D III.C.4 (stating that an adjudication captain must review the infraction record for, among other things, evidence showing that the investigating captain was a witness to and/or participant in the incident).

82.     Third, Mr. Murphy's rights were denied due to Defendant Walker's, Defendant Williams's and Defendant D. Johnson's non-disclosure of relevant, material evidence of the bizarre facts underlying the charge to Defendant Captain Perry.

83.     In early June 2015, Defendant Captain Perry substantiated the escape charge against Mr. Murphy and sentenced him to thirty (30) days in punitive

segregation.  Mr. Murphy had to serve those thirty (30) days in addition to the twenty-three (23) days he had spent in isolation waiting for his hearing.  See NYC DOC Directive 6500R-D III.B (stating, among other things, that an inmate "shall not be held in [Pre Hearing Detention] for more than seven (7) business days").

84.     Defendant Captain Perry's action was arbitrary and not adequately supported by evidence in part by the record as herein described.

85.     On June 18, 2015, Mr. Murphy filed an Article 78 proceeding in New York State Supreme Court, Bronx County.  In this Article 78 proceeding, Mr. Murphy challenged the arbitrary result of the June 2015 disciplinary proceeding as well as many other arbitrary decisions taken against him while in NYC DOC custody, for example, the more recent CMC review decisions.

86.     As a result of the Article 78 filing, the New York State Supreme Court scheduled Mr. Murphy for court appearances over and over again.  However, in order to attend, Mr. Murphy was at the mercy of Defendants.

87.     John/Jane Doe Defendants kept Mr. Murphy from getting his day in Court by disingenuously claiming over and over that they were simply unable to get Mr. Murphy to Bronx Supreme Court in time for the Article 78 proceedings over and over again.  Defendants blamed Mr. Murphy's CMC status—the existence and regular renewal of which Mr. Murphy's Article 78 proceeding was filed to challenge—as part of the reason that they could not produce him in Court on time.

88.     On one occasion, John/Jane Doe Defendants took Mr. Murphy for a Court date; produced him at Court only after the Court's calendar had concluded for the day; then delayed Mr. Murphy's return to his cell so that he was not back until roughly 2:00 a.m.

## Defendants Commence Criminal Proceedings Against Mr. Murphy For The Sheet Incident, Causing Him To Be Falsely Arrested And Maliciously Prosecuted

89.     On June 16, 2015, Mr. Murphy was arrested while incarcerated.

90.     Defendant Officer Walker commenced a criminal proceeding against Mr. Murphy relating to the sheet allegations even though Defendant Officer Walker knew that he had provided false evidence to Defendant Captain Perry.  Defendant Captain Williams failed to intervene knowing the same.  On the basis of Defendant Walker's false statements regarding the sheets, the D.A.'s Office charged Mr. Murphy with felony promotion of the possession of contraband.

91.     On December 17, 2015, a state court dismissed the charges against Mr. Murphy.

## Defendant Captain Harvey Arbitrarily And Maliciously Restricts Mr. Murphy's Visitation Rights

92.     On or about October 20, 2015, Mr. Murphy's father was visiting Mr. Murphy.

93.     Mr. Murphy's CMC status already causes Mr. Murphy to have restricted

visits during his pretrial incarceration.

94.     By chance the Corrections Captain supervising family visits that day was Defendant Captain Harvey who, with Defendant CO R. Johnson, had commenced the unsuccessful prosecution of Mr. Murphy on the wrongful pantry assault charges.

95.     Defendant Captain Harvey and Mr. Murphy saw each other and Defendant Captain Harvey recognized Mr. Murphy.

96.     Defendant Captain Harvey later approached Mr. Murphy and handed him a Notice stating that for one full year thereafter he would be limited to non-contact booth visits from his family.

97.     Mr. Murphy had already been limited to booth visits as a result of the key incident.

98.     Now, without any discernable legitimate reason, Defendant Captain Harvey restricted Mr. Murphy's visits even further.  The notice states that the additional restriction was "for security reasons" which Defendant Captain Harvey did not identify any specific acts to justify the limitation.  See NYC DOC Directive #2007R-B (stating that such limitation "must be based on specific acts . . . that demonstrate his/her threat to the safety of the institution").

99.     It is reasonable to infer on these facts, and Mr. Murphy believes, that Defendant Captain Harvey committed this arbitrary act against him in order to retaliate against him for successfully exercising his right to challenge her previous

violation of his rights in connection with the false charges she commenced against him.

**Monell Allegations**

100.    All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to customs, policies and/or practices which the City maintains in furtherance, one supposes, of maintaining order in its correctional facilities.

101.    The manner in which the City adjudicates disciplinary allegations against inmates at Rikers Island does not work.  It is either corrupted by individuals who seek retaliatory or other objectives other than due process, for example, the manufacture by NYC DOC employees of false evidence to commence a proceeding against an individual inmate, then the adjudication captain's unwillingness to seriously test the charges by using fair procedures or by drawing reasonable conclusions from the facts before them.

102.    The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York

as well as in New York State courts, and as reported in the news and by organizations from civil society.  See David Anthony Fullard, Supervision and Discipline of COs are Key to Stopping Violence on Rikers Island, Sept. 18, 2014, at  http://www.truth-out.org/news/item/26243-effective-supervision-and-rational-discipline-of-corrections-officers-are-key-to-stopping-an-explosion-of-violence-on-rikers-island (last accessed June 13, 2016); Norman Seabrook, What's Really Wrong with Rikers, Aug. 24, 2014, at http://www.nytimes.com/2014/08/25/opinion/whats-really-wrong-with-rikers.html?_r=0 (last accessed June 13, 2016); Michael Winerip and Michael Schwirtz, Rikers: Where Mental Illness Meets Brutality in Jail, July 14, 2014, at http://www.nytimes.com/2014/07/14/nyregion/rikers-study-finds-prisoners-injured-by-employees.html?_r=0 (last accessed June 13, 2016); Michael Schwirz, Corruption Sweep at Rikers Island Leads to 22 Arrests, June 24, 2014, at http://www.nytimes.com/2014/06/25/nyregion/2-officers-and-20-inmates-are-arrested-in-corruption-sweep-at-rikers-island.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 13, 2016).

103.    In addition, the City is aware of this fact through less formal complaints made such as the ones described in this case, i.e., an inmate's resort to administrative grievance procedures, Notices of Claim, complaints to the Board of Corrections, or complaints to 311.    On information and belief, the volume of such calls for

investigation into rights violations is great.  Mr. Murphy's experience represents but one individual's experience at the NYC DOC correctional facilities of the chronic fabrication of evidence and the chronic failure to provide meaningful process.

104.    Defendant City of New York and supervisory officials within its NYC DOC are thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights, for example, the use of unnecessary and/or excessive force to injury inmates and have failed to take sufficient steps to stop instances of excessive force from continuing.  By way of another example, Defendant City and its agents are also aware of the failings of the NYC DOC's failure to provide reliable due process protections to its charges.  In fact, the due process failures are so frequent and well known, inmates often do not even expect to receive due process, resulting in a culture that aggravates rights violations by fomenting individuals' apathy toward even trying to make robust use of that process. See First Report of the <u>Nunez Independent Monitor,</u> <u>Nunez v. City of N.Y.,</u> No. 11 Civ. 5845 (LTS) (JCF), <u>Docket No. 269</u> (May 31, 2016); <u>see</u> <u>also</u> Winnie Hu and Kate Pastor, <u>Trial of 5 Rikers Guards Brings Out Culture of Violence at Jail,</u> June 8, 2016 (reporting on allegations that officers assaulted inmate, then fabricated allegations that the inmate committed physical violence first), at

http://www.nytimes.com/2016/06/09/nyregion/trial-of-5-rikers-guards-brought-out-culture-of-violence-at-jail.html (last accessed June 13, 2016); Michael Schwirtz, Federal Monitors for Rikers Island Cite Progress and Violence, May 31, 2016, at

http://www.nytimes.com/2016/06/01/nyregion/federal-monitors-for-rikers-island-cite-progress-and-violence.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 12, 2016).

105.     Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Murphy's constitutional rights.

106.   Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that Individual Defendants named herein lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.  On information and belief, Defendant City of New York knew this because public records searches show that certain individual corrections officers implicated here have previously been the subjects of good faith inmate complaints. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.

107.    All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

108.    All of the aforementioned acts deprived Mr. Murphy of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

109.    The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as corrections and law enforcement officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

110.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

111.    As a result of the foregoing, Mr. Murphy is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

112.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

113.   Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

114.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

115.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
## First Amendment Retailiation

116.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

117.   Defendants violated Plaintiff's First Amendment rights.

118.   Plaintiff engaged in protected speech in response to Defendants' misconduct including, but not limited to, filing IGRPs, filing grievances with administrative deputies, defending himself robustly at his disciplinary hearings by

identifying Defendants' inconsistencies and fabrications, instructing his mother (who had better access to various methods of communication) to report misconduct to the Board of Corrections and 311 as his agent, and more.

119.   Defendants took adverse action against Plaintiff including, but not limited to, falsely reporting him for misbehavior.  Many times Defendants' fabricated evidence was revealed for what it was as a consequence of Plaintiff's efforts to defend himself.  Although Plaintiff "won" in those circumstances, it was never before he had to spend time in punitive segregation waiting for a much-delayed hearing to exonerate himself.  Still other times, Plaintiff met with a wall of institutional resistance to hearing allegations of CO misconduct and Plaintiff suffered even worse consequences when sentenced.

120.   There was often a causal connection between Plaintiff's protected speech and Defendants' adverse acts.  This connection can be reasonably inferred from the facts as described above, for example, Captain Harvey's arbitrary actions against Plaintiff when she encountered him for the first time after many months had passed since he was exonerated of the false charges she helped bring against him.

121.   In addition, through Defendants' intentional failure to produce Plaintiff in court for any of his Article 78 hearings, Defendants deprived Plaintiff of his right

to petition for redress of grievances relating to what Plaintiff perceived to be the NYC DOC's arbitrary actions.

122.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

123.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
### Excessive Force

124.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

125.   Defendants violated the Fourth and Fourteenth Amendments because they used excessive force against Plaintiff without justification, causing him serious physical harm in the process.

126.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

127.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## False Arrest and Malicious Prosecution

128.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

129.   Defendants violated Plaintiff's right under 42 U.S.C. § 1983 to be to be free from false arrest and malicious prosecution under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

130.   Among other things discussed herein, Defendants' criminal prosecution of Plaintiff constituted false arrest and malicious prosecution in that there was no basis for Plaintiff to be arrested for the fabricated sheet allegations, yet Defendants effected that arrest by virtue of their false statements about the sheets, then continued the related prosecution with malice knowing that it rested on fabricated evidence.

131.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

132.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## Denial of Constitutional Right to Fair Trial and Fabrication of Evidence

133.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

134.   Individual Defendants created false evidence against Plaintiff as described herein.

135.   Individual Defendants forwarded false evidence to prosecutors in the District Attorney's Office as described herein.

136.   In creating false evidence against Plaintiff, and in forwarding false evidence to prosecutors, Defendants violated Plaintiff's constitutional right to a fair trial and to be free from having correction officers fabricate evidence against him under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

137.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

138.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## "Class of One" Equal Protection Claim And Fourth Amendment Unreasonable Search Claim

139.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

140.   Defendants singled Plaintiff out from similarly situated inmates for a harassing program of, inter alia, cell searches that frequently left his cell in disarray. Plaintiff was searched disproportionately from other inmates.

141.   These searches, disproportionately directed at Plaintiff, were not supported by any purpose other than to harass him, and served no penological interest.

142.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

143.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## Due Process

144.   Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

33

145.   As described above, certain Individual Defendants arbitrarily imposed discipline upon Plaintiff which had the effect of depriving him of a liberty interest through random and unauthorized acts.

146.   As herein described, by way of example, Defendants provided Plaintiff with no process at all relative to the CMC issue and despite Plaintiff's entreaties that he be heard due to the completely unjustified imposition of that discipline in the aftermath of the dismissal of the handcuff-key charges.   Another example: Defendants arbitrarily and randomly held Plaintiff's hearing relating to the sheets allegations (which, although fabricated, did not allege any violent act, just the collection of sheets) behind a thick metal door through which the adjudication captain and Plaintiff were unable to hear each other.

147.   In imposing discipline upon Plaintiff without due process (none of which Plaintiff seeks to reverse, as he has already endured the consequences), these Defendants caused him to unjustifiably suffer an abrogation of a cognizable constitutional interest.  Plaintiff was a pretrial detainee and as such his liberty interest, even though admittedly abrogated due to the mere fact of his incarceration, was often greater than that of convicted inmates, not least because pre-trial detainess may not be punished.  Yet almost from the moment Plaintiff was placed in Defendants' care— within the month, in fact—Defendants' random and unauthorized misconduct, even as they purported to provide Plaintiff with process, created unreasonably onerous

prison conditions for Plaintiff as opposed (1) to other, similarly situated inmates, and (2) to what the law states is the minimum liberty restriction that a pre-trial detainee should have to endure as default conditions.

148. For example, and as explained above, Plaintiff was subject to special CMC housing, transportation protocols, visitation limitations and other restrictions as a result of Defendants' misconduct, all throughout his time in custody. In addition, Plaintiff's already unjustifiably restricted existence was regularly subject to additional restriction when he was sent to punitive segregation while awaiting a disciplinary hearing or after an unjustifiable sentence for even more punitive segregation.

149. With respect to the punitive segregation, although duration is not the only relevant factor to consider in terms of whether a pre-trial detainee has experienced an atypical and severe hardship while in custody, Plaintiff here had the unique—or perhaps common, as the <u>Monell</u> allegations of this lawsuit hold— experience of being regularly and lightly put through the disciplinary process on the basis of fabricated evidence. In a system in which COs' misconduct becomes more and more regularized, as Plaintiff's experience was here, it is reasonable to infer that all of these transgressions, when taken together, demonstrate that Plaintiff suffered an experience that was different than the ordinary incidents of prison life, something akin to continuing violation doctrine in other legal contexts.

150.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

151.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

### EIGHTH CLAIM
### Cruel and Unusual Punishment (Through Due Process Clause)

152.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

153.   Pre-trial detainees like Plaintiff should be subjected to no punishment, yet Defendants subjected Plaintiff to cruel and unusual punishment when they assaulted him, causing him serious physical harm.  In addition, Defendants subjected him to cruel and unusual punishment because they unjustifiably yet knowingly and maliciously and/or indifferently designated him as CMC, which in turn sent him to a housing unit where he was regularly exposed to serious harm and risk of harm as described herein.

154.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

155.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## NINTH CLAIM
## Failure to Intervene

156.   Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

157.   Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

158.   Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

159.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

160.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**TENTH CLAIM**
**MONELL CLAIM**

161.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

162.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

163.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiff's rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its corrections officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

164.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYC DOC constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

165.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC were the direct and proximate cause of the constitutional violations suffered by Plaintiff as described herein.

166.   Unfortunately, the aforementioned inappropriate manner in which the City performs administrative justice—fabrication of evidence and arbitrary and random decisionmaking at disciplinary hearings—is common within the NYC DOC facilities at Rikers Island and other locations.  Individuals either perform retaliatory or otherwise inappropriate acts outside the ends of justice, and the NYC DOC's administrative disciplinary procedures are tainted by a general, known, yet long-uncorrected culture that does not attach sufficient value to an individual's right to due process when accused of an infraction.

167.   The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  In addition, the City is aware of this fact through less formal actions taken such as the ones described in this case, i.e., Mr. Murphy's mother's telephone calls to the Board of Corrections or 311.  Considering the frequency with which Mr. Murphy individually telephoned the Board of Corrections

or 311 to report misconduct suffered by Mr. Murphy, the aggregate number of calls must be enormous and place the City on notice that corrective action is overdue to address the chronic fabrication of evidence and the chronic absence of meaningful process described in this pleading only by way of one individual's experience.   On information and belief, discovery of other like complaints would reveal impressive results.

168.   Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Murphy's constitutional rights.

169.   Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.   Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.

170.   All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

171.   All of the aforementioned acts deprived Mr. Murphy of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

172.   The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as NYC DOC employees, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

173.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

174.   As a result of the foregoing, Mr. Murphy is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully request the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of their claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendment rights of Plaintiff, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:    July 29, 2016
          New York, New York

*Ryan Lozar*

Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
Fax: 1-877-666-4456
ryanlozar@gmail.com

*Attorney for Plaintiff*

42