The Law Office of Ryan Lozar, P.C.
305 Broadway, 10th Floor, New York, NY 10007
Tel: (310) 867-1562; Alternate Tel: (646) 666-8262; Fax (877) 666-4456
ryanlozar@gmail.com
www.ryanlozar.com



SEPTEMBER 27, 2017

Re:   Ernest Murphy v. City of N.Y., No. 16 Civ. 4415 (AJN)

Dear Judge Cott:

  I represent Plaintiff Ernest Murphy in the above-captioned Section 1983 action alleging, inter alia, misconduct on the part of New York City Department of Correction Officers which resulted in the violation of Mr. Murphy's constitutional rights.  As the Court knows, Plaintiff filed a discovery motion, Docket No. 86, and Defendants have responded, Docket No. 91.  This is Plaintiff's reply.  I will deliver hard copies of Plaintiff's supporting Exhibits to your Chambers for review in connection herewith.

I.   **Records relating to disciplinary charges, specifications, evidence, sanction that directly relate to the July 2013 incident.**

  Individual Defendants Sinacore, Gilkes, Deallie and Pittman oppose production of the full file containing records relating to disciplinary charges, specifications, prosecutions, sanctions and more relating to the July 2013 that is a subject of this complaint (hereinafter "Records" for ease of discussion).  Defendants accepted Negotiated Plea Agreements (NPAs) to settle related prosecutions.

  Plaintiff argues that the Records should be produced in their entirety, yet at this writing Defendants have produced one draft Memorandum of Complaint (MOC) for each Defendant, Exh. 1, and the NPAs without supporting documentation, Exh. 2.[1]  This is a tiny fraction of the Records which include, but are not limited to, charges, specifications, evidence collected to support the prosecution, tribunal filings and appearance records, plea minutes, sanction recommendations and imposition information, and more.  See, e.g., N.Y. Civ. Serv. L. § 75.

  By way of one example, the Records likely contain witness statements and other evidence relating to the incident.  In the lead-up to Defendants' April 28, 2017, OATH trial, Plaintiff sat for an audio-recorded interview with DOC prosecutors.  In April 2017, I was coordinating with DOC again for Plaintiff to sit for a second such interview when, on or about April 18, 2017, Defendants accepted NPAs and obviated the trial.  As Plaintiff's representative, I was able to obtain an audio record of Plaintiff's DOC interview and a copy of an exhibit from the proceeding, which I produced to Defendants in discovery.  Given the advanced stage of prosecutors' preparation for trial, there would likely be additional witness statements and evidence which Plaintiff argues is relevant and should be produced.

  Another example of likely evidence in the Records are color digital photographs taken of Plaintiff's injuries on the date of the incident.  At this writing, Defendants have only located abysmal

---

[1] Plaintiff also notes that he contests the redactions from these Exhibits (and from any hypothetical future production of Records) of witness names, Defendant names and information relating to whether Defendants were on modified assignment or probation (presumably although not necessarily relating to the July 2013 incident).  It is unclear what privilege could justify these redactions given that witnesses are already known to the Parties and the Defendants are named in the action.

black-and-white versions of this evidence of near-useless quality. Exh. 3. Because DOC prosecutors began to preserve and collect evidence in 2013 or 2014, digital or at least color versions of these photos are likely to be in the Records.

Next, the Records contain copies of Defendants' actual disciplinary charges, specifications, proceedings, negotiations, pleas, sanction documents, and more. The few MOCs and the NPAs that have been produced help highlight the relevance of the balance of this material and Plaintiff's need for it. MOCs are prepared at an early stage of the disciplinary process before charges are even formulated and filed, and Plaintiff only has a single draft version of one MOC for each Defendant. Exh. 1. The drafts thus have no clear connection as foundational documents for the NPAs. Relatedly, the NPAs on their face show various omissions in discovery because they: (1) reference but do not include various disciplinary charges referenced therein, some or all of which related to the July 2013 incident and which were supplanted by amended (possibly through negotiation) MOCs/charges;[2] (2) reference attached documents but do not include them; (3) reference the Defendants' appearances at conference but do not include minutes from the conference, tribunal plea colloquy, or any other prior appearances; (4) show the Commissioner's eventual approval of sanctions but does not include records showing the sanction's valuation in terms of Defendants' compensation loss (the actual value of the negotiated sanction—which the NPAs describe only in terms of days—is relevant to the seriousness with which DOC viewed the offense, Defendants' own views regarding their risk exposure and willingness to admit guilt rather than go to trial, and more). Exh. 2.

The problem with the woefully incomplete production of these Records—only draft MOCs and NPAs without attachments—is that it fails to permit any understanding of elements and facts that the Defendants' acceptance of the NPAs incorporate by reference. Compare Exh. 1, with Exh. 2. In order to meaningfully understand what an individual's acceptance of a plea to disciplinary charges actually establishes for the purposes of arguable issue preclusion, the Parties must be able to consider information which includes, but is not limited to, the elements and facts supporting a plea (which may be found, for example, in a charging instrument or tribunal colloquy). City Defendants understand this very well, as case law shows that they regularly invoke NPAs in this manner for estoppel effect when it benefits them in adversarial proceedings—for example, to argue that an employee who accepted an NPA is later estopped from re-litigating the allegations to which s/he previously admitted. See, e.g., Hollomon v. City of NY, No. 04 Civ. 2964 (NG) (JMA), 2006 WL 2135800, at *6 (EDNY July 31, 2006) (rejecting City's argument that estoppel principles required the pleading-stage dismissal of an employee's retaliation claim due to the employee's acceptance of a plea relating to infractions, and noting that the employee was entitled to litigate the estoppel effect of that plea); Tankard v. Abate, 213 A.D.2d 320, 321 (1st Dep't 1995) (factual summary showing that the City terminated a correction employee for a technical rule violation without a hearing, relying upon his acceptance of a plea agreement to settle rule violations as precluding his ability to claim tenure protections); see Martinez v. O'Leary, No. 13-2967-cv, 2014 WL 984052 (2d Cir. Mar. 6, 2014) (Corporation Counsel arguing, in a

---

[2] On information and belief, the charges and specifications began with use-of-force charges, but later were converted or reduced to false-statement charges only. See, e.g., Exh. 2 at D1073 (negotiating the dismissal of a specification about which there is no information in discovery although a relevant document is supposed to be attached to the NPA, but is not).

brief filed before the Second Circuit, that an employee who accepted a plea agreement placing her on probationary status could not later argue that she was entitled to a pre-termination hearing).

## II. Records relating to charges that were "bundled" with the NPAs arising from July 2013 incident.

Plaintiff also argues that he is entitled to the production of all files incorporated into the NPA addressing the July 2013 incident for many of the same reasons discussed supra, i.e., they are necessary to understand the NPAs. At the outset, I first note that it is possible that some or all bundled charges in a particular NPA actually do correspond to the July 2013 incident. The list of bundled charges in certain NPAs do not necessarily indicate that they arise from different sets of misconduct. Exh. 2. For example, it is possible that one charge corresponding to a use-of-force allegation arising from the July 2013 incident might have been bundled with a false-arrest charge arising from related investigations. This is the problem with Defendants' withholding of nearly all Records—it is impossible to tell.

Even assuming arguendo, that certain NPAs bundled charges arising from wholly unrelated events, and only one of these was the July 2013 incident, Plaintiff argues that he is still entitled to receive the files corresponding to all bundled charges. Here I incorporate by reference my above argument regarding Plaintiff's right to litigate the significance and effect of Defendants admission of guilt in the NPAs, and what part of the global sanction imposed by the NPAs might correspond to Defendants' misconduct arising from the July 2013 incident in particular.

If the Court were to credit Defendants' argument that Plaintiff is not entitled to discovery relating to the NPAs that they knowingly bundled in April 2017 when this litigation was active and Plaintiff had already requested these records, Defendants and other officers would feel emboldened going forward to manipulate the disciplinary-charge-resolution process to withhold and/or obfuscate plainly relevant information from federal discovery. Furthermore, I note that Defendants' argument that the other charges contain medical and/or off-duty-conduct information should not settle the issue. It is not likely that that the bundled charges sought to discipline Defendants for a medical condition or innocuous off-duty conduct but, in any event, the Parties have a Confidentiality Order requiring me to treat confidential materials sensitively according to its terms and conditions.

## III. Personnel, investigative, disciplinary and sanction records relating to Johnson and other Defendants involved in the challenged December 2013 incident.

Defendants have indicated that they do not dispute that they will produce records relating to certain Defendants and non-parties relating to officer misconduct in a December 2013 incident that is also addressed in the complaint. In summary, the dispute relating to the delayed records may be resolved by the conference. The Parties will continue to confer pending the conference and we will update the Court at that time.

By way of brief background, in case it is necessary if the Parties do not resolve the dispute before the conference, these records relate to a December 2013 incident in which Defendant Johnson

and non-parties were investigated and charged for dereliction of duty when an inmate in their care was attacked by another inmate while officers were not properly on post. Exh. 5. Defendant Johnson, who knew he would face scrutiny for his omissions while assigned to a post, falsely and arbitrarily pinned blame for the incident on Plaintiff. Then, when the injured inmate affirmatively identified someone else almost immediately, Defendant Johnson and his supervisor Defendant Harvey had to save face regarding the initial false infraction against Plaintiff. Johnson's and Harvey's actions perpetuated the false infraction against Plaintiff knowing it was false, which involved Defendant Harvey taking a chief role in the related investigation despite her own involvement in the underlying misconduct and self-interest in an exonerating result (for Defendants). Exh. 6. While investigating, Harvey even permitted Johnson to amend and renew the false infraction against Plaintiff after Johnson was disciplined for not watching his post even though this fact fatally undermined his ability to accuse Plaintiff or anyone (to say nothing of the victim's actual positive identification of someone else). Exh. 5 (returning Dec. 15); Exh. 6 (Harvey noting the Johnson problems, passim, but insisting he was instrumental in identifying Plaintiff as a culprit); Exh. 7 (amending infraction Dec. 18).

The misconduct had serious and lasting consequences for Plaintiff. The false infraction, which was forcefully supported by Harvey's knowing abrogation of fair process, was cast as gang-related and Plaintiff, who had no Security Risk Group (SRG) security restrictions prior to the incident, Exh. 9, thereafter had one imposed for the remainder of his pretrial detention until he was acquitted. The compounding effects of this and the other, erroneous enhanced-security designations on the length of Plaintiff's incarceration, among other things, are discussed below.

### IV. Other personnel, investigative, disciplinary and sanction records.

At this writing, I have received what appear to be nearly fifty pages of wholly redacted indices detailing allegations of certain Defendants' misconduct in their employment and, presumably, their eventual dispositions/sanctions. Exh. 4. The Parties will confer about the potential removal of some or all of these redactions so that the indices might guide informal conference about record productions; meanwhile, and as the Court knows from Defendants' response, Corporation Counsel has offered to let me visit their office to review files. Docket No. 91. The Parties will schedule an appointment for this and the viewing may resolve index- and file-related disputes as to certain Defendants. The Parties will inform the Court in a timely manner.

### V. Redactions and withholdings of Plaintiff's own security information.

In Plaintiff's opening motion, he noted the redaction and withholding of certain information relating to his security classification. The Court may recall that Plaintiff's claims allege in relevant part that Defendants' misconduct created, continued and compounded injurious consequences through ever-harshening enhanced-security designations. For example, the July 2013 gave rise to a CMC enhanced-security designation which was renewed for years—nearly until Plaintiff's acquittal—with reference to Plaintiff's "possession of a handcuff key," a charge of which he was exonerated. The same pro forma and years-long continuation of Plaintiff's SRG status occurred as a result of the cleared charges arising from the December 2013 process failure. Plaintiff filed an Article 78 seeking to challenge the CMC designation, but the experience of that Article 78 itself demonstrated the

designation's insidious effects, as DOC repeatedly invoked "lack of sufficient staff" to explain why Plaintiff could not be timely transported to related court appearances. For the same reasons, the CMC designation complicated Plaintiff's ability to more expeditiously defend against the criminal charges for which he was on pre-trial in the first instance, causing longer detention until acquittal than he would have otherwise experienced.

Defendants have agreed that they will remove redactions from a few already-produced documents to show the calculation of Plaintiff's security classifications at specific moments in time. Exh. 8 (two of three pages redacted). Insofar as these select documents provide limited, date-specific glimpses regarding the calculation of Plaintiff's enhanced-security designations, the Parties will confer about whether and to what extent supplemental record productions are needed to satisfy this discovery request.

Sincerely,

Ryan Lozar
Attorney for Plaintiff